**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2026 IL App (3d) 240574-U

Order filed July 30, 2026

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2026

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-24-0574 Circuit No. 19-CF-583 |
| DIEONTAE SPARKS, | ) ) ) | Honorable Amy Bertani-Tomczak, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HOLDRIDGE delivered the judgment of the court.
Justice Peterson and Justice Anderson concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:  (1) The defendant did not receive ineffective assistance of counsel, and (2) the defendant's sentence did not violate the proportionate penalties clause.

¶ 2    The defendant, Dieontae Sparks, appeals his convictions for first degree murder, armed robbery, and unlawful possession of a weapon, arguing (1) he was denied effective assistance of counsel, and (2) his sentence violated the proportionate penalties clause of the Illinois constitution.

¶ 3                                  I. BACKGROUND

¶ 4 The defendant was convicted of murdering Reginald Harris during a robbery. At trial, the State called Avery Harris, Reginald's cousin. Avery testified that he sometimes sold small amounts of marijuana to make money. One of the people to whom he sold marijuana was the defendant, and on March 30, 2019, Avery received text messages from the defendant's phone number. He and the defendant arranged to meet at an address in Romeoville.

¶ 5 Reginald was with Avery at the time, and he sat in the passenger seat as Avery drove to the agreed address. When they arrived, Avery sent a text to the defendant, and the two men waited. As they were waiting, the defendant entered the car through the rear passenger door, put a gun to Avery's head, and told Avery to give him all his money and marijuana. Avery complied, handing "[l]ess than $100" to the defendant. The defendant was not satisfied with the amount of money, and he struck Avery on the forehead and the side of the face with the gun.

¶ 6 Reginald got out of the car. He moved toward the back of the car, possibly to confront the defendant, but there was "somebody else" standing outside the passenger side door. That person was armed with a shotgun, and he took some cash from Reginald. The person said, "I'm just going to shoot him," and, without hesitating, shot Reginald in the abdomen. Reginald collapsed back into the car, closed the door, and the two of them drove away. Avery drove directly to the nearest hospital, but Reginald died of his wounds shortly afterward.

¶ 7 Avery initially denied knowing the defendant, but he eventually admitted he was involved in selling marijuana, and that he knew the defendant. Avery identified the defendant in a photo lineup, and he allowed officers to view a series of texts showing the history of drug transactions between Avery and the defendant.

¶ 8 Crime scene investigators recovered a spent shotgun shell from the location where Reginald was shot. The shell was a spent Remington .12-gauge shot shell. Based on Avery's

identification of the defendant, officers obtained a search warrant for the defendant's grandmother's home, where they located a shotgun, shotgun ammunition, and mail addressed to the defendant.

¶ 9          The State called Kurt Zielinski, who was qualified as an expert firearm identification analyst. Zielinski worked at the Illinois State Police Crime Laboratory where, he testified, the "primary concern" of his field was "to determine if a bullet, a cartridge case or any other ammunition component was fired from a particular firearm." He accomplished this task by test-firing firearms and examining the characteristics of bullets and cartridges. After he was assigned to analyze the evidence gathered in this case, he test-fired the Remington 870 Express Magnum .12-gauge pump action shotgun collected from the defendant's bedroom. He compared the resulting spent shell casing with the shotgun shell casing recovered from the site of Reginald's shooting and concluded the recovered shell was fired from the same shotgun. He reached this conclusion because the spent shells had the same "class characteristics" (same gauge level, same size shot, same manufacturer, same case color) and matching "individual characteristics" (matching firing pin impressions and markings on the breechface). He used a comparison microscope to observe the breechface markings.

¶ 10         Zielinski also testified that shotgun shells recovered from the defendant's grandmother's home were the same gauge, had the same manufacturer, the same size pellets, and were the same color as the shell recovered from the site of the murder. He did not offer any photographs or any testimony about which areas or markings matched, nor any testimony about error rates or what degree of similarity would be required to verify a match. On cross-examination, he admitted that wear-and-tear or lack of cleaning could change the individual characteristics of both the firing pin and the breechface. He also admitted that temperature, moisture, humidity, and

3

environmental issues might affect the breechface markings. Further, he admitted that any .12-gauge shell could be fired from any .12-gauge shotgun.

¶ 11    Lisa Ramos, a DNA analyst from the Illinois State Police Crime Laboratory, testified that she analyzed swabs from (1) the right shoulder of a driver seat, (2) the front passenger side door interior, (3) a shotgun, and (4) the inner and outer door handle of a rear passenger side door. She compared those swabs to Reginald, Avery, the defendant, and a fourth individual. The DNA evidence analyzed by Ramos suggested Avery's DNA was included in the swab taken from the right shoulder of the driver seat. The DNA obtained from the shotgun was 16.2 times more likely to have originated from the defendant than others, which provided "very limited support" for his inclusion. However, on the inner rear passenger door handle, the mixture of DNA obtained was 5.64 septillion times more likely to have originated from the defendant than others, which provided strong support for his inclusion in that sample.

¶ 12    The jury found the defendant guilty of Reginald's murder (720 ILCS 5/9-1(a)(3) (West 2018)), armed robbery with respect to Avery and Reginald (720 ILCS 5/18-2(a)(2) (West 2018)), and unlawful possession of a weapon (720 ILCS 5/24-1.1(a) (West 2018)). The jury found that the defendant, or one for whom he was legally responsible, was armed with a firearm during the commission of the offenses.

¶ 13    A sentencing hearing was held at which the State introduced a Pre-Sentence Investigation report (PSI). The PSI revealed that the defendant was 19 years old at the time of the offense, and he suffered from anxiety and depression. He had previously been diagnosed with post-traumatic stress disorder. The defendant's counsel did not present any evidence relating to the defendant's youth. Instead, defense counsel called the defendant's mother and requested a sentence at the lower end of the sentencing range. The defendant was sentenced to 56 years in prison, the

mandatory minimum sentence for first degree murder and armed robbery. The defendant appealed.

¶ 14                                    II. ANALYSIS

¶ 15        On appeal, the defendant argues (1) he received ineffective assistance of counsel, and (2) his sentence violated the proportionate penalties clause. We address each argument in turn.

¶ 16                         A. Ineffective Assistance of Counsel

¶ 17        The defendant argues his counsel was ineffective for failing to (1) object to Zielinski's conclusion that the shell found at the scene was fired from a particular firearm, (2) request a *Frye* hearing on the admissibility of Zielinski's testimony, and (3) better cross-examine Zielinski "so as to educate the jury regarding the controversies and questions that have been raised about the reliability of firearm comparison testimony."

¶ 18        Ineffective assistance of counsel claims are judged under the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *Strickland* suggests a two-prong test to establish ineffective assistance of counsel. *Id*. First, the defendant must establish that his counsel's performance fell below an objective standard of reasonableness, as measured against prevailing professional norms. *People v. Colon*, 225 Ill. 2d 125, 135 (2007) (citing *Strickland*, 466 U.S. at 694). Second, "the defendant must demonstrate that, but for defense counsel's deficient performance, the result of the proceeding would have been different." *People v. Coleman*, 183 Ill. 2d 366, 397 (1998). Both prongs must be satisfied to establish a claim of ineffective assistance of counsel, and courts may resolve ineffectiveness claims by reaching only the second prong because "lack of prejudice renders irrelevant the issue of counsel's performance." *Id*. at 397-98.

¶ 19        Here, the defendant questions the validity of firearm comparison testimony generally and argues his attorney should have done more to prevent Zielinski from testifying that the shell

recovered from the scene of Reginald's murder was fired from the shotgun recovered from the defendant's bedroom. However, our review of the record reveals that, even without Zielinski's testimony comparing spent shell casings, the evidence establishing the defendant's involvement in the crime was overwhelming. Avery knew the defendant and had a history of interactions with him. The defendant texted Avery to arrange their meeting, entered the back seat of the car, and committed an armed robbery. Avery's text messages confirmed the defendant's role in setting up the meeting. DNA evidence corroborated the defendant's presence in the back seat of the vehicle. In the course of the robbery, Reginald was killed with a shotgun by an unknown person. Police located a shotgun and shells in the defendant's bedroom, and the shells were of the same manufacturer, gauge, shot size and color as the shell located at the scene of the robbery-turned-murder.

¶ 20    Even if we assume, *arguendo*, that defendant's counsel was ineffective for failing to challenge Zielinski's testimony, he is unable to establish the prejudice prong of the *Strickland* test due to the overwhelming nature of the evidence. See *People v. Harris*, 182 Ill. 2d 114, 137 (1998) (even assuming defense counsel's failure to object to challenged evidence was deficient performance, ineffective assistance not established where the remaining evidence is overwhelming). The State presented detailed and unimpeached testimony from an eyewitness who knew the defendant, along with physical evidence corroborating his testimony. We therefore find the defendant was not prejudiced by his attorney's performance with respect to the firearm identification evidence presented at trial.

¶ 21                                B. Proportionate Penalties Violation

¶ 22    Next, the defendant argues that his 56-year sentence violates the proportionate penalties clause of the Illinois constitution. He suggests his sentence constitutes a *de facto* life sentence, and

6

that it violates the proportionate penalties clause to impose such a sentence on "a 19-year-old offender with mental health and substance abuse issues who was not the principal shooter in this case." Alternatively, the defendant argues his counsel was ineffective for failing to develop a sufficient record to support a challenge under the proportionate penalties clause.

¶ 23        We review as-applied constitutional challenges *de novo*. *People v. House*, 2021 IL 125124, ¶ 18. The proportionate penalties clause of the Illinois constitution mandates that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. A sentence runs afoul of the proportionate penalties clause when the "punishment for the offense is cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community." *People v. Miller*, 202 Ill. 2d 328, 338 (2002).

¶ 24        We note initially that, following the submission of this case, our supreme court released *People v. Spencer*, 2025 IL 130015, which holds that defendants who are eligible for parole review after serving 20 years of their sentence are not serving a *de facto* life sentence, since they can be released before spending 40 years in prison. *Id.* ¶ 40. Thus, as the defendant is eligible for parole after serving 20 years (see 730 ILCS 5/5-4.5-115(b) (West 2024)), he is not serving a *de facto* life sentence. Nonetheless, individuals challenging their sentences need not allege that a life sentence was imposed to bring a challenge under the proportionate penalties clause. *Id.* ¶ 43.

¶ 25        It is paramount that the record be sufficiently developed to bring an as-applied constitutional challenge because such challenges are reliant on the application of the law to the specific facts and circumstances alleged by the challenger. *Id.* ¶ 44. When the defendant alleges, as here, that the evolving science on juvenile maturity and brain development should bear on the

court's determination of his sentence, the defendant must first raise this claim in the trial court to develop an evidentiary record. *People v. House*, 2021 IL 125124, ¶ 29.

¶ 26   In *Spencer*, our supreme court held that the proper venue for the defendant's as-applied challenge to his sentence was a postconviction proceeding because the record was not sufficiently developed. *Id*. ¶ 45. Indeed, our supreme court has repeatedly admonished defendants under similar circumstances that a postconviction proceeding permits defendants to raise as-applied constitutional claims that were not initially raised in the trial court. See *People v. Harris*, 2018 IL 121932, ¶ 48; *People v. Thompson*, 2015 IL 118151, ¶ 44. In those cases, as here, the defendants attempted to bring as-applied proportionate penalties clause challenges for the first time on direct appeal, and those claims were rejected. *Spencer*, ¶ 45; *Harris*, ¶ 48. However, the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq*. (West 2018)) offers a venue for individuals to assert that their convictions resulted from a substantial denial of their constitutional rights. *People v. Hilliard*, 2023 IL 128186, ¶ 18. We find the record insufficiently developed on direct appeal to rule on the defendant's proportionate penalties claim.

¶ 27                                    III. CONCLUSION

¶ 28   The judgment of the circuit court of Will County is affirmed.

¶ 29   Affirmed.